Weatherspoon Fam. LLC v. Hatteras Inv. Partners, L.P., 2026 NCBC 12.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CVS038870-910

WEATHERSPOON FAMILY LLC,

      Plaintiff,

v.

HATTERAS INVESTMENT
PARTNERS, L.P. and DAVID B.
PERKINS,

      Defendants,

and

HATTERAS EVERGREEN PRIVATE
EQUITY FUND, LLC,

      Nominal Defendant.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED
COMPLAINT**

1. This matter is before the Court a second time on a motion to dismiss—this time on Defendants' and Nominal Defendant's Rule 12(b)(1) motion to dismiss Plaintiff's first amended complaint. (ECF No. 66).

2. After Defendants and Nominal Defendant moved to dismiss Plaintiff's initial complaint in this action, (ECF No. 24), Plaintiff purported to take a voluntary dismissal without prejudice without leave of the Court, (ECF No. 49), and alternatively sought leave to file an amended complaint, (ECF No. 54). Thereafter, as no answer had been filed and Plaintiff had not previously amended its original complaint, Plaintiff was permitted to file an amended complaint as a matter of right, and the motion to dismiss the original complaint was denied as moot. (ECF No. 63).

3. Defendants and Nominal Defendant have now moved to dismiss the amended complaint pursuant to Rule 12(b)(1). (ECF No. 66).

4. As explained below, and for substantially similar reasons to those set out by the Court in its initial Order and Opinion in this matter, (ECF No. 63), the Court **GRANTS** the motion and dismisses this action without prejudice.[1]

> *Malmfeldt Law Group P.C., by Paul D. Malmfeldt; Milberg Coleman Bryson Phillips Grossman, PLLC, by Matthew E. Lee, Eric G. Steber, and Jeremy R. Williams; and Silver Law Group, by Scott L. Silver, for Plaintiff Weatherspoon Family LLC.*
>
> *Parker Poe Adams & Bernstein, LLP, by Melanie Black Dubis, Jack K. Belk, Jr., and Corri A. Hopkins, for Defendants Hatteras Investment Partners, L.P. and David B. Perkins.*
>
> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Greg Gaught, Gabrielle E. Supak, and Jennifer K. Van Zant, for Nominal Defendant Hatteras Evergreen Private Equity Fund, LLC.*

Houston, Judge.

## I. FACTUAL BACKGROUND

5. The Court does not make findings of fact but instead summarizes the factual allegations relevant to its determination of the motion. *Meyer v. Hatteras Inv. Partners, L.P.*, 2025 NCBC LEXIS 140, *3 (N.C. Super. Ct. Oct. 10, 2025) (addressing Rule 12(b)(1) motion); *Deleuran v. Thompson*, 2025 NCBC LEXIS 109, *1 (N.C. Super. Ct. Aug. 22, 2025) (addressing Rule 12(b)(1) and Rule 12(b)(6) motion). Though the Court has previously addressed the alleged facts of this case, and Plaintiff's amended

---

[1] As the Court previously noted, in a putative derivative action, an entity named as a nominal defendant generally may not "defend" itself against claims brought on its behalf. *E.g.*, *Swenson v. Thibaut*, 39 N.C. App. 77, 101 (1978). Here, however, Plaintiff has not contested Evergreen Fund's right or ability to join in the motion to dismiss, and any such dispute is moot inasmuch as the same Rule 12(b)(1) arguments are appropriately raised by Defendants and considered by the Court accordingly.

complaint reasserts substantially the same facts, the Court nonetheless summarizes the relevant factual allegations again for ease of reference.

6.      Plaintiff Weatherspoon Family LLC ("**Plaintiff**") is a North Carolina limited liability company. (ECF No. 55.1, ¶ 19).

7.      Since at least 2017, Plaintiff has been a member of, and a minority investor in, Nominal Defendant Hatteras Evergreen Private Equity Fund, LLC ("**Evergreen Fund**" or "**Nominal Defendant**"), a Delaware limited liability company that historically invested primarily in private equity limited partnerships. (ECF No. 55.1, ¶¶ 1, 19, 30).

8.      Evergreen Fund's "stated business objective is to achieve long-term capital appreciation by investing in a diversified portfolio of private investments." (ECF No. 55.1, ¶ 4). In 2017, Plaintiff invested approximately $2 million in Evergreen Fund, receiving membership interests in Evergreen Fund in return. (ECF No. 55.1, ¶ 19).

9.      From its inception through 7 December 2021, Evergreen Fund "held a diversified portfolio of alternative assets, including private equity limited partnership interests." (ECF No. 55.1, ¶ 4).

10.     Throughout that time and to the present, defendant Hatteras Investment Partners, L.P. ("**HIP**"), a Delaware limited partnership, has served as manager of Evergreen Fund. HIP's majority owner and manager, defendant David B. Perkins, has maintained functional control over Evergreen Fund via HIP's role as its manager. (ECF No. 55.1, ¶¶ 2–21).

11.	HIP and Evergreen Fund are parties to an advisory agreement pursuant to which HIP is compensated in fees based on the stated value of Evergreen Fund's assets. (ECF No. 55.1, ¶ 2).

12.	In late 2021, in a transaction spearheaded by HIP and Perkins, Evergreen Fund—with a then-diversified portfolio of approximately $42.9 million in alternative assets—"use[d] substantially all of its assets to purchase preferred equity shares" in The Beneficient Company Group, LLP ("**Ben**"), a startup that is not a party to this action and that "had little value at the time of the transaction." (ECF No. 55.1, ¶¶ 5, 30–31, 59–62). In addition to exchanging its alternative asset portfolio, Evergreen fund also paid approximately $3.5 million in cash. (ECF No. 55.1, ¶ 6). Thus, Evergreen Fund's total investment in Ben was approximately $46 million. (ECF No. 55.1, ¶ 6).

13.	At the same time, the Hatteras Master Fund, L.P. ("**HMF**"), also a "HIP-sponsored fund" and not a party to this action, separately purchased Ben securities. HMF's relationship with HIP was similar to Evergreen Fund's relationship with HIP—paying fees "based on the stated value of its assets according to an advisory agreement." (ECF No. 55.1, ¶ 7). In that instance, the consideration for HMF's purchase of Ben securities was HMF's alternative asset portfolio, valued at around $400 million, and Ben contracted with HIP to manage the alternative assets that HMF contributed to Ben (the "**HMF Advisory Contract**"), while HIP also retained its existing advisory contracts. (ECF No. 55.1, ¶¶ 7–10). Though Plaintiff alleges that Ben "promised the Adviser an investment advisory contract" generally, Plaintiff does

not contend that any such contract existed or was otherwise consummated between Ben and HIP with respect to Evergreen Fund's transaction and assets, as opposed to the HMF Advisory Contract. (ECF No. 55.1, ¶ 38; *see generally* ECF No. 55.1). Instead, the "promised" contract was apparently a promise of "advisory fees for managing the assets that Hatteras Master Fund [not Evergreen Fund] would contribute to Ben." (ECF No. 55.1, ¶ 39).[2]

14. At the time of Evergreen Fund's and HMF's respective investments, Ben was an early-stage startup company with a limited operating history. Though Ben advertised its business model as one generating interest and fees by offering liquidity products to holders of alternative assets, Ben's primary business model was ultimately to invest directly in alternative assets. (ECF No. 55.1 ¶¶ 8, 11, 31).

15. Ben's parent company was GWG Holdings, Inc., a publicly traded company. (ECF No. 55.1, ¶ 13). On 5 November 2021, GWG disclosed in its annual Form 10-K (for the 2020 reporting year) that the Securities and Exchange Commission was investigating GWG and Ben, with a focus on Ben's accounting practices. (ECF No. 55.1, ¶¶ 31–32). The filing also indicated that Ben was historically unprofitable as an entity, with a declining portfolio over the course of several years. (ECF No. 55.1, ¶¶ 32–35).

---

[2] Though Plaintiff treats the "Ben Transaction" as a single overall transaction in its briefing, Plaintiff defines the "Ben Transaction" by reference only to the Ben-Evergreen Fund transaction. (ECF No. 55.1, ¶ 5 (defining "Ben Transaction" as "the transaction" in which "Perkins and HIP caused Evergreen Fund to use substantially all of its assets to purchase preferred equity securities in a singular startup company")). Further, Plaintiff's complaint makes clear that the HMF transaction with Ben and the Evergreen Fund transaction with Ben were two separate purchases of securities—one by Evergreen Fund, (ECF No. 55.1, ¶ 5), and one by HMF, (ECF No. 55.1, ¶ 7), an entirely separate entity.

16. Shortly thereafter, on 29 November 2021 and in light of debate regarding GWG's viability as a going concern, Ben was spun off from GWG, and the transaction was publicly announced several days later. (ECF No. 55.1, ¶¶ 35–36).

17. On 7 December 2021, after Ben was spun off from GWG, Evergreen Fund nonetheless exchanged its portfolio of alternative assets for preferred equity interests in Ben. (ECF No. 55.1, ¶¶ 5, 30). HIP, as manager of Evergreen Fund, effectuated the transaction via Perkins. According to Plaintiff, Evergreen Fund's portfolio was "reported" to be valued at $43 million and "consisted primarily of private equity limited partnerships." (ECF No. 55.1, ¶¶ 5, 30).

18. At approximately the same time, Plaintiff contends that HIP and Ben entered into contracts under which HIP had an "opportunity" to "co-sponsor new investment funds" and "obtained the right to require Ben to seed these funds" with alternative assets that were to be contributed by Evergreen Fund and HMF in their respective transactions. This arrangement was publicly disclosed in Ben's SEC filings made in 2023. (ECF No. 55.1, ¶ 11).

19. Plaintiff also asserts that Ben agreed to pay "the Adviser" (an undefined term apparently used in the complaint in reference to HIP—also at times spelled "Advisor") advisory fees "for managing the assets that Hatteras Master Fund would contribute to Ben." (ECF No. 55.1, ¶ 39; *see generally* ECF No. 55.1, ¶¶ 37–40).

20. Plaintiff asserts that these "extraordinary business opportunities" between HIP and Ben "were contingent on Evergreen Fund's completion of" its investment in

Ben. This arrangement was publicly disclosed in Ben's SEC filings made in 2023. (ECF No. 55.1, ¶ 12).

21. In the several years *after* the 7 December 2021 transaction between Evergreen Fund and Ben, GWG (Ben's former parent company) went bankrupt. GWG's founder and several of its officers and directors were sued in connection with the alleged diversion of cash that was purportedly invested by GWG in Ben, and various other allegations have been raised regarding perceived internal wrongdoing between GWG and Ben between 2017 and 2021. (ECF No. 55.1, ¶¶ 54–55).

22. Ultimately, Evergreen Fund's investment in Ben resulted in the loss of most of the value of Evergreen Fund's assets. (ECF No. 55.1, ¶¶ 14, 62). Ben's value dropped precipitously, with its shares falling from approximately $8 per share to approximately $.02 per share by the time this suit was filed. (ECF No. 55.1, ¶ 60). Thus, as a result of the Ben Transaction, the value of Evergreen Fund's alternative asset portfolio decreased by more than $40 million. (ECF No. 55.1, ¶ 62).

23. Plaintiff contends that HIP and Perkins ignored numerous "red flags" in causing Evergreen Fund to transact with Ben, that they consummated the transaction due to personal interests, and that their conduct was otherwise wrongful and harmful to Evergreen Fund. (ECF No. 55.1, ¶¶ 13, 30–53). For example, Plaintiff asserts that unidentified representatives of Ben provided offering documents and other information disclosing that Ben had a limited operating history, that it lacked an established customer base and interests in it were illiquid, and that there were

otherwise significant and inherent risks in investing in such securities. (ECF No. 55.1, ¶¶ 41–43).

24.    Plaintiff asserts that, ignoring many of these red flags, Perkins made various false statements to HMF's board of directors to convince HMF to enter into its transaction with Ben and to allow HIP to enter into the HMF Advisory Contract. (ECF No. 55.1, ¶¶ 44–53, 73). As noted above, however, HMF is not a party to this action.

25.    Plaintiff also contends that Defendants breached their purported fiduciary duty to Evergreen Fund by causing Evergreen Fund to enter into its transaction with Ben in an effort to "pursue business opportunities and profits for themselves that would not be shared with Evergreen Fund." (ECF No. 55.1, ¶ 73).

26.    Thus, Plaintiff filed this putative derivative suit but declined to make a pre-suit demand on HIP (or Perkins) to investigate or otherwise to assert claims. (ECF No. 55.1, ¶¶ 15–16, 68). Plaintiff instead contends that such a demand would have been futile because "HIP and Perkins each face a substantial risk of personal liability on account of Evergreen Fund's claims" and "acted in bad faith and breached their duty of loyalty to Evergreen Fund by using Evergreen Fund's assets to pursue lucrative business opportunities for themselves" and not for Evergreen Fund. (ECF No. 55.1, ¶ 16).

27.    However, Evergreen Fund's Amended and Restated Limited Liability Company Agreement dated 1 April 2020 (the "**LLC Agreement**"), the operative company agreement, grants HIP the "full and exclusive right, power and authority to

manage and conduct the business and affairs of the Fund." (ECF No. 55.1, ¶¶ 25–26; ECF No. 67.3, § 2.6(a)).[3] That same LLC Agreement provides that the manager of Evergreen Fund (in this case, HIP) generally may not be held liable for its conduct under the agreement absent "willful misfeasance, bad faith or gross negligence." (ECF No. 67.3, § 3.4(a); ECF No. 55.1, ¶ 28). Though HIP is permitted to delegate its "rights, powers and authority" to others in its discretion and subject to applicable law, it has not done so. (ECF No. 55.1, ¶ 26; ECF No. 67.3, § 2.6(a)).

28.     Under the LLC Agreement, the parties also expressly agreed that:

> [a]ny Member, Manager, or any of their Affiliates, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, . . . provision of investment advisory or brokerage services, . . . or entering into any other commercial arrangements. No other Member or Manager shall have any rights in or to such activities, or any profits derived therefrom.

(ECF No. 67.3, § 3.3(b)).

29.     In its amended complaint, Plaintiff asserts a single cause of action for breach of fiduciary duty against Defendants on behalf of Evergreen Fund. (*See generally* ECF No. 55.1).

30.     Defendants and Evergreen Fund have moved to dismiss the first amended complaint under Rule 12(b)(1) on the basis that Plaintiff has failed to adequately plead demand futility in accordance with applicable law. (*See generally* ECF No. 67).

---

[3] The Court may, and properly does, consider the text of the LLC Agreement, (ECF No. 67.3), which is referenced, incorporated into, and integral to the allegations of the amended complaint. (ECF No. 55.1, ¶¶ 25–29). *See State ex rel. Cooper v. Seneca-Cayuga Tobacco Co.*, 197 N.C. App. 176, 181 (2009); *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60–61 (2001).

## II. ANALYSIS

### a. Rule 12(b)(1) Legal Standards and Delaware Law

31. A Rule 12(b)(1) motion presents "a challenge to the trial court's subject matter jurisdiction over a plaintiff's claims." *Marlow v. TCS Designs, Inc.*, 288 N.C. App. 567, 572 (2023); N.C. R. Civ. P. 12(b)(1).

32. Ultimately, "[t]he plaintiff bears the burden of establishing subject matter jurisdiction." *Lau v. Constable*, 2022 NCBC LEXIS 75, *10 (N.C. Super. Ct. July 11, 2022) (citations omitted). In considering a challenge to subject matter jurisdiction, the Court "may consider matters outside the pleadings." *Harris v. Matthews*, 361 N.C. 265, 271 (2007).

33. In the context of a putative derivative action, "[t]he challenge to the adequacy of any pre-suit demand is, *inter alia*, a challenge to the Court's subject matter jurisdiction over the derivative claims." *Petty v. Morris*, 2014 NCBC LEXIS 67, *4 (N.C. Super. Ct. Dec. 16, 2014); *Meyer*, 2025 NCBC LEXIS 140, at *28 (addressing motion to dismiss on standing grounds for putative derivative action under Delaware law).

34. Under Article 8 of the North Carolina Limited Liability Act, "[i]n any derivative proceeding in the right of a foreign LLC, the matters covered by [Article 8] will be governed by the law of the jurisdiction of the foreign LLC's organization" with limited exceptions not applicable here. N.C. Gen. Stat. § 57D–8–06; *Egelhof v. Szulik*, 2006 NCBC LEXIS 5, *41 (N.C. Super. Ct. Mar. 13, 2006); *see also Banyan Mezzanine Fund II, LP v. Rowe*, 2016 NCBC LEXIS 38, *8–9 (N.C. Super. Ct. May 10, 2016).

35.    Evergreen Fund is a Delaware limited liability company, and its LLC Agreement is governed by Delaware law. (ECF No. 67.3, § 9.5(a)).

36.    Thus, Plaintiff's cause of action is governed by Delaware law. N.C. Gen. Stat. § 57D–8–06; *Egelhof*, 2006 NCBC LEXIS 5, at *17; *Banyan,* 2016 NCBC LEXIS 38, at *8–9.

37.    Under Delaware law, before filing a derivative action, a shareholder or member generally must make a demand on the entity's board of directors, manager, or comparable managerial authority to investigate or to take other action concerning the entity's claims. Del. Ch. Ct. R. 23.1 (Delaware rule governing requirements for derivative actions); *see, e.g.*, *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047–48 (Del. 2021).

38.    The "demand requirement is a substantive requirement" in derivative actions governed by Delaware law. *Zuckerberg*, 262 A.3d at 1047.

39.    Thus, absent a pre-suit demand, the shareholder or member "must plead facts *with particularity* that demonstrate the reasons why demand would have been futile" such that the failure to make a demand should be excused. *Egelhof*, 2006 NCBC LEXIS 5, at *18–19 (emphasis in original); *see also* Del. Ch. Ct. R. 23.1; *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

40.    If the plaintiff fails to do so, "the complaint must be dismissed, regardless of the strength of his claim on the merits." *Egelhof*, 2006 NCBC LEXIS 5, at *18–19 (noting also that "[p]leadings in derivative suits . . . must comply with stringent

requirements of factual particularity that differ substantially from . . . permissive notice pleading" (alteration in original) (citation omitted)).

41.    Delaware law requires courts to consider three factors to determine whether a plaintiff has made adequate factual allegations of demand futility:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Zuckerberg*, 262 A.3d at 1059. The latter factor requires a plaintiff to plead particularized facts justifying a "reasonable doubt" that the individual to whom demand would be made lacks independence. *Id.* at 1060–61.

42.    "[T]he reasonable doubt standard used in a demand futility analysis provides a higher hurdle for a plaintiff than the relatively lenient standard of review pursuant to Rule 12(b)(6)." *In re Trade Desk, Inc. Derivative Litig.*, 2025 Del. Ch. LEXIS 40, at *34 n.120 (Del. Ch. Feb. 14, 2025) (unpublished) (citation omitted).

43.    The plaintiff's "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" in other contexts and must include "particularized factual statements that are essential to the claim," known as "ultimate facts," "principal facts" or "elemental

facts." *Brehm*, 746 A.2d at 254 ("A prolix complaint larded with conclusory language . . . does not comply with these fundamental pleading mandates.").

44. Ultimately, an affirmative answer to any of the three *Zuckerberg* factors as to at least half of the relevant decision makers excuses the demand requirement as futile. *Zuckerberg*, 262 A.3d at 1059.

**b. <u>Defendants' and Nominal Defendant's Rule 12(b)(1) Motion to Dismiss</u>**

45. Plaintiff affirmatively pleads and admits that it did not make a demand of HIP (as manager of Evergreen Fund) or Perkins (as manager of HIP), nor did Plaintiff make any other pre-suit demand concerning its breach of fiduciary duty cause of action asserted in this action. (ECF No. 55.1, ¶ 68). Defendant and Evergreen Fund contend that Plaintiff has failed to adequately plead that its pre-suit demand obligation was excused. (ECF Nos. 66, 67, and 70).

46. After evaluating each of the three *Zuckerberg* prongs, the Court determines that Plaintiff has failed to plead facts demonstrating that demand would have been futile or that the demand requirement should otherwise be excused.

i. <u>Material Personal Benefit to Defendants</u>

47. The Court first considers whether Plaintiff has adequately and particularly pleaded facts suggesting that Defendants received a "material personal benefit" from the transaction between Ben and Evergreen Fund. *Zuckerberg*, 262 A.3d at 1058.

48. Plaintiff contends that Defendants both received "immediate material financial benefits" from "causing Evergreen Fund" to enter into the Ben Transaction. (ECF No. 55.1, ¶¶ 10, 15). These benefits were allegedly in the form of (i) the HMF

Advisory Contract and advisory fees that HIP (or the "Adviser") was promised in connection with the *HMF* transaction with Ben, and (ii) the general ability to co-sponsor new funds and to require Ben to seed such funds. (*See* ECF No. 55.1, ¶¶ 8–12).

49.  Defendants, on the other hand, contend that these purported benefits were not material personal benefits because (i) the alleged benefit from the HMF Advisory Contract was separate and apart from any alleged benefit arising from Evergreen Fund's distinct transaction with Ben, (ii) the complaint does not otherwise plead non-conclusory factual allegations demonstrating that the HMF Advisory Contract was material to Evergreen Fund's transaction with Ben, and (iii) Plaintiff's allegations are conclusory and fail to plead with specificity the particular benefits to Defendants arising from the Evergreen Fund transaction. (ECF No. 67 at 10–14).

50.  Construing the allegations of the complaint in the light most favorable to Plaintiff, the Court determines that Plaintiff has failed to adequately plead particularized facts demonstrating a material personal benefit to Defendants in connection with the Evergreen Fund transaction as opposed to the HMF transaction. *See, e.g.*, *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 59 (Del. 2017) (declining to excuse demand).

51.  As Defendants correctly observe, the Court's inquiry is whether Plaintiff adequately pleads that the manager "received a material personal benefit *from the alleged misconduct that is the subject of the litigation demand*." *Zuckerberg*, 262 A.3d at 1058 (emphasis added); *see also Orman v. Cullman*, 794 A.2d 5, 30 (Del. Ch. 2002)

(determining plaintiff failed to adequately allege any "benefit *from the transaction being challenged*" (emphasis in original)); (ECF No. 67 at 10–11).

52. Here, the alleged wrongdoing (and, thus, the basis for this action) is Evergreen Fund's transaction with Ben—not HMF's transaction with Ben or the HMF Advisory Contract. HMF is not a party to this action, and Plaintiff's lone putative derivative cause of action is for breach of a fiduciary duty allegedly owed to Evergreen. While Plaintiff's allegations concerning the HMF Advisory Contract successfully paint Defendants in a poor light, they are also largely immaterial to, and do not support, the underlying cause of action.

53. Ultimately, Plaintiff's allegations concerning Evergreen Fund's transaction amount to assertions that (i) "Ben offered the Adviser lucrative business opportunities contingent on the completion of the transaction," and (ii) "Ben promised the Adviser an investment advisory contract" as a result of which the "Adviser would receive a base fee as well as a performance allocation." (ECF No. 55.1, ¶¶ 37–38). However, Plaintiff expressly claims that these specific purported fees would be "advisory fees from the Master Fund based on the stated value of the Ben securities held by [HMF]; the Adviser would also receive advisory fees for managing the assets that [HMF] would contribute to Ben"—all of which concern funds to be received from HMF (advisory fees) and from Ben for managing funds contributed by HMF. (ECF No. 55.1, ¶ 39).[4]

---

[4] Plaintiff alleges that HIP already "receive[d] advisory fees on the basis of the stated value of Evergreen Fund's assets." (ECF No. 55.1, ¶ 2). Those advisory fees are not, based on the pleading, specifically tied to the Ben-Evergreen Fund transaction or the HMF-Ben transaction.

54. In its brief, Plaintiff focuses on these same alleged benefits flowing to Defendants—i.e., those potential funds flowing to Defendants from the HMF Advisory Contract and transaction rather than from the Evergreen Fund transaction. (ECF No. 69 at 12–18).

55. Thus, the Court determines that the allegations in the complaint fail to particularly and specifically plead facts or even reasonable inferences of a benefit to Defendants as a result of the Evergreen Fund transaction, much less a material personal benefit. *Zuckerberg*, 262 A.3d at 1059; *Orman*, 794 A.2d at 30.

56. The Court further determines that, even if Plaintiff had adequately alleged a benefit to Defendants, Plaintiff has failed to demonstrate that it was "material" to these particular Defendants.

57. Plaintiff's arguments concerning the materiality of the alleged benefit to Defendants largely hinge on two bases: (i) the overall amount of money involved in the transactions, and (ii) the allegation that Perkins made misrepresentations to HMF's board in connection with the HMF transaction. (ECF No. 69 at 12–18). These arguments do not, however, rely on pleaded and particularized facts concerning the specific alleged benefits to Defendants.

58. Plaintiff alleges that the eventual assets contributed to Ben totaled approximately $446 million—around $400 million of which was specifically attributable only to the HMF transaction and only around $46 million of which was attributable to the Evergreen Fund transaction. (ECF No. 55.1, ¶¶ 6–10, 40).

59. Despite Plaintiff's amended efforts to insert eye-poppingly-large sums of money in its allegations, "there is no bright-line dollar amount at which" amounts received by a manager "become material" for purposes of excusing the demand requirement in a derivative action. *Orman*, 794 A.2d at 30; (*see also* ECF No. 32 at 18–19). For precisely this reason, the size of the transaction alone does not render an alleged benefit "material" to the recipient; instead, the plaintiff must make a particularized showing of how and why the benefit is allegedly material. *See Horman v. Abney*, 2017 Del. Ch. LEXIS 13, at *39 (Del. Ch. Jan. 19, 2017) (unpublished) (holding that alleged wrongdoing and futility of demand could not be reasonably inferred "based solely upon the size or duration of the alleged wrongdoing"); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 Del. Ch. LEXIS 151, at *36–37 (Del. Ch. Oct. 12, 2011) (unpublished) (concluding that $670 million size of transaction was insufficient to excuse pre-suit demand requirement, particularly when coupled with conclusory allegations); *see also Trade Desk*, 2025 Del. Ch. LEXIS 40, at *34 n.120.

60. Though the transaction here involved an investment by Evergreen Fund into Ben of more than $40 million, (ECF No. 55.1, ¶ 6), Plaintiff's complaint fails to quantify in any particularized way the alleged benefit to Defendants from the Ben-Evergreen Fund transaction (i.e., the amount of the advisory fees or other similar alleged benefits). (*See generally* ECF No. 55.1, ¶¶ 6; *see also* ECF No. 69 at 12–14).

61. Plaintiff does not, for example, specify any percentage of the funds under management, the "base fee," or the "performance allocation" that HIP (or, in turn, Perkins) allegedly would receive, nor does Plaintiff otherwise provide specific

information concerning the actual amounts to be received by Defendants or *how* those amounts would be material to these particular Defendants. *See Orman,* 794 A.2d at 23 (explaining that materiality is analyzed and determined "in the context of the director's economic circumstances" (emphasis, citations, and internal quotation marks omitted)).

62. Rather, Plaintiff pleads in conclusory terms that the proposed agreement between Ben and HIP was "lucrative" or for "lucrative business opportunities." (ECF No. 55.1, ¶¶ 8, 16, 37). These allegations are not sufficient to particularly plead the materiality of the alleged benefit. *Brehm*, 746 A.2d at 254.

63. Plaintiff further contends that Perkins made misrepresentations to HMF's board in connection with *HMF's* transaction with Ben and that the act of making misrepresentations to HMF's board necessarily means that there was a material benefit to Defendants from the distinct Evergreen Fund transaction. (ECF No. 69 at 17–18).

64. Specifically, Plaintiff asserts that "Perkins would not have made false statements to [HMF's] Board to obtain approval of the Ben Transaction if the benefits that Defendants were to receive were immaterial to them," such that "[t]he only reasonable explanation" is that Perkins lied for the purportedly material benefit of these "lucrative business opportunities." (ECF No. 69 at 17–18).

65. People, of course, lie frequently—often about the most mundane of things— and those lies are often immaterial. *See, e.g.*, *Wetherington v. NC Dep't of Pub. Safety*, 270 N.C. App. 161, 191 (2020) (determining that a State Trooper's knowingly false

statements this his hat blew off of his head, rather than that he left it on the light bar of his car and lost it, were "not a severe violation of the [North Carolina State Highway Patrol's] truthfulness policy" that warranted termination for cause).

66. In fact, under both Delaware and North Carolina law, for example, one element of fraud is that the misrepresentation be of a "material fact." *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 124 (Del. Ch. 2003); *In re Est. of Heiman*, 235 N.C. App. 53, 57–58 (2014).

67. Using Plaintiff's reasoning, this requirement would be redundant and unnecessary because people must lie *only* about issues that are material or for which there is a material benefit. (*See* ECF No. 69 at 17–18). This does not align with reality or applicable case law and is not convincing for purposes of its defense against the motion at issue.

68. Considering the requirements of Delaware law and the need for particularized pleading, the Court concludes that the amended complaint fails to adequately and particularly plead facts reflecting that either Defendant received a material personal benefit with respect to Evergreen Fund's transaction with Ben, and Plaintiff has therefore failed to demonstrate that pre-suit demand should be excused on the basis of the first prong of the *Zuckerberg* test.

ii. "Substantial Likelihood" of Liability

69. The Court next considers whether Plaintiff has adequately pleaded that Defendants face a substantial likelihood of liability with respect to Plaintiff's lone

cause of action in the case—one for breach of fiduciary duty. (ECF No. 55.1, ¶¶ 70–74).

70. Again considering the allegations of the complaint in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to do so and that Plaintiff therefore may not rely on the second prong of the *Zuckerberg* test to excuse its failure to make a pre-suit demand.

71. In connection with the "substantial likelihood of liability" prong of *Zuckerberg*, "[t]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of" a manager. Rather, "[t]he court 'must be satisfied that . . . plaintiff[s] ha[ve] alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.'" *Cent. Laborers' Pension Fund v. Karp*, 2025 Del. Ch. LEXIS 99, at *17 (Ch. Apr. 25, 2025) (explaining that "Plaintiffs must make a threshold showing, through the allegation of particularized facts, that their claim[] has some merit." (citations and internal quotation marks omitted)).

72. In this case, though the Ben-Evergreen Fund transaction "turn[ed] out poorly in hindsight," *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1186–87 (Del. 2015), Plaintiff has failed to plead particularized facts demonstrating that Defendants face a substantial likelihood of liability with respect to Plaintiff's breach of fiduciary duty cause of action.

73.     Among Delaware's robust protections for those with authority over a limited liability company is the business judgment rule, which presumes that corporate directors, officers, and managers are discharging their duties "in good faith and with reasonable care, even if their actions turn out poorly in hindsight." *In re TransUnion Derivative S'holder Litig.*, 324 A.3d 869, 884 (Del. 2024).

74.     Where an LLC agreement limits the manager's liability—as is the case here with respect to HIP—the plaintiff generally must demonstrate that the claims are not excluded by the terms of the LLC agreement. *Cornerstone*, 115 A.3d at 1186–87; (*see* ECF No. 67.3, § 3.4(a) (providing that "No Manager, former Manager, officer or former officer of [Evergreen Fund] shall be liable to the Fund or to any of its Members for any loss or damage occasioned by any act or omission in the performance of such person's services under this Agreement, unless it shall be determined by final judicial decision on the merits from which there is no further right to appeal that such loss is due to an act or omission of such person constituting willful misfeasance, bad faith or gross negligence involved in the conduct of such person's office or as otherwise required by applicable law.").

75.     Though Plaintiff asserts in its briefing that "HIP Owes Evergreen the Fiduciary Duties of Loyalty and Care," Plaintiff also expressly waives in its briefing any alleged duty of care violation by Defendants, confirming that its complaint "alleges a duty of loyalty violation, not a duty of care violation" with respect to its cause of action for breach of fiduciary duty. (ECF No. 69 at 22 n.13; *see also* ECF No. 69 at 19 n.12 ("The Amended Complaint does not allege that Perkins owes Evergreen

a duty of care."), 21 (asserting that Perkins faces liability because he "breached his duty of loyalty") and 23 (asserting that HIP "acted in bad faith and in violation of its duty of loyalty")).

76. Accordingly, in light of this waiver by Plaintiff, the Court will only consider whether Plaintiff has demonstrated that Defendants face a substantial likelihood of liability for breach of fiduciary duty under a theory of violating their purported duty of loyalty. *See Welch v. Welch*, 288 N.C. App. 627, 630 (2023) (matters waived or abandoned before the trial court are generally deemed waived for all purposes, including appeal). In doing so, the Court considers whether the facts pleaded would be sufficient to overcome a presumption that Defendants reasonably exercised their business judgment under the business judgment rule. *See Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001) (indicating that the business judgment rule applies to the duty of loyalty).

77. "[T]he duty of loyalty mandates that the best interest of the [organization] and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 842 (Del. Ch. 2022) (citations and internal quotation marks omitted).

78. "The duty of loyalty includes a requirement to act in good faith, which is 'a subsidiary element, i.e., a condition, of the fundamental duty of loyalty'. . . . 'A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation.'"

*Id.* (citations omitted); *see also Feeley v. NHAOCG, LCC,* 62 A.3d 649, 670-71 (Del. Ch. 2012) (explaining that the duty of loyalty applies in the LLC context).

79. However, Delaware law "permits a limited liability company to limit or eliminate the liability that a fiduciary will face in the event of breach" of that fiduciary duty:

> A limited liability company agreement may *provide for the limitation or elimination of any and all liabilities* for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

*Feeley*, 62 A.3d at 663–64 (emphasis in original) (quoting Del. Code tit. 6, § 18-1101(c)).

80. "Limiting or eliminating liability is different than limiting or eliminating the underlying duty. A provision that limits or eliminates liability only addresses one of the available remedies for breach of duty, i.e., liability for money damages. It does not limit or eliminate the duty itself." *Metro Storage,* 275 A.3d at 846–47 (citations omitted).

81. The standard for pleading and providing a breach of the duty of loyalty is higher than for the duty of care:

> Directors' decisions must be reasonable, not perfect. "In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." . . . [I]f the directors failed to do all that they should have

> under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty.

*Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243–44 (Del. 2009) (citation omitted).

82. Thus, to state a claim (and otherwise to demonstrate a substantial likelihood of liability), a plaintiff must plead facts indicating that the defendant consciously and knowingly failed to carry out the defendant's duties to the organization—i.e., that it acted in bad faith, with similarly improper motives, or otherwise not in good faith. *UFCW & Participating Food Indus. Empls Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 897 (Del. Ch. 2020) (determining plaintiff failed to plead futility of demand where plaintiff failed to allege facts showing defendant acted "in bad faith" or that it was otherwise "reasonable to think that [the defendant] would be held liable after trial"); *McElrath v. Kalanick*, 224 A.3d 982, 993 (Del. 2020) ("As we have noted before, 'there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.'" (citation omitted)); *Firefighters' Pension Sys.,* 251 A.3d at 253; *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (explaining that the duty of loyalty requires a director to "act[] in the good faith belief that her actions are in the corporation's best interest.").

83. Thus, where an LLC agreement exculpates individuals from liability except for bad faith or fraudulent or illegal conduct, the plaintiff should "plead particularized facts that demonstrate that the directors acted with scienter, *i.e.,* that they had 'actual or constructive knowledge' that their conduct was legally improper." *Wood v.*

*Baum*, 953 A.2d 136, 141 (Del. 2008) (determining plaintiff failed to particularly plead breach of duty where agreement at issue exculpated director "except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct"); *Ibew Local Union 481 Defined Contribution Plan & Tr. v. Winborne*, 301 A.3d 596, 619 (Del. Ch. 2023) ("Delaware decisions have read those rules together to require that a plaintiff plead particularized facts that can support a reasonable inference about the directors' state of mind."); *Newman v. KKR Phorm Invs., L.P.*, 2023 Del. Ch. LEXIS 699, at *13–14 (Del. Ch. Sep. 5, 2023) ("This Court has held on numerous occasions that to state a bad-faith claim, a plaintiff must show . . . that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." (citation omitted)); *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 463 (Del. Ch. 2023) ("'[W]illful misconduct' . . . involves either malicious conduct or 'conduct designed to defraud or seek an unconscionable advantage.'" (citation omitted)); *see also Meyer*, 2025 NCBC LEXIS 140, at *26–27.

84. Here, in support of its argument, Plaintiff contends that Defendants acted wrongfully in three primary ways: (i) ignoring purported "red flags" about the Ben-Evergreen Fund transaction, (ii) making alleged misrepresentations to HMF's board in connection with the HMF transaction or purchase, and (iii) procuring the HMF Advisory Contract and the general ability to co-sponsor new funds and to require Ben to seed such funds. (*See* ECF No. 55.1, ¶¶ 13, 33, 37–40).

85. The "red flags" on which Plaintiff relies to support its claim for breach of fiduciary duty, however, are primarily that Defendants caused Evergreen Fund to invest in Ben despite (i) a disclosure in another entity's Form 10-K filing about an investigation into Ben's accounting practices, (ii) Evergreen Fund's stated business objective of investing in a "diversified portfolio of private investments," particularly "alternative" assets, (iii) Defendants' vaguely described alleged agreements to co-sponsor or co-manager new funds with Ben, and (iv) numerous events that occurred after the Ben-Evergreen Fund transaction, such as the bankruptcy of GWG. (*See* ECF No. 55.1, ¶¶ 30-58).

86. While they might demonstrate exceptionally poor business judgment, these allegations fail to demonstrate willful misfeasance or bad faith, largely for the reasons set forth in Defendants' briefing. (*See, e.g.*, ECF Nos. 67 and 70); *see, e.g.*, *In re Molycorp, Inc. S'holder Derivative Litig.*, 2015 Del. Ch. LEXIS 152, at *29, *38 (Del. Ch. May 27, 2015) (unpublished) (explaining that a party generally may not rely on hindsight to create an inference of wrongful conduct); *Cent. Laborers' Pension Fund*, 2025 Del. Ch. LEXIS 99, at *17; *In re TransUnion*, 324 A.3d at 884–85.

87. Inasmuch as Plaintiff relies on Perkins's alleged misrepresentations to HMF's board, (ECF No. 55.1, ¶¶ 44–53), HMF is not a party to this action, nor are there non-conclusory factual allegations that the Ben-Evergreen Fund transaction was contingent on the HMF transaction.[5] Even if the alleged misrepresentations were

---

[5] Plaintiff alleges that "HIP's extraordinary business opportunities were contingent on *Evergreen Fund's* completion of the Ben Transaction," (ECF No. 55.1, ¶¶ 12, 37 (emphasis added)), but not that the Ben-Evergreen Fund transaction was contingent on the HMF transaction. Though Plaintiff alleges that HMF's board "approved" the "Ben Transaction,"

sufficient to demonstrate bad faith in connection with the Ben-HMF transaction or purchase, there are not factual allegations explaining how they would have any bearing on the Ben-Evergreen Fund transaction, and the current allegations do not give rise to a reasonable inference that Defendants face a substantial likelihood of liability in connection with the Ben-Evergreen Fund transaction.

88. The events occurring *after* the Ben-Evergreen Fund transaction, such as GWG's bankruptcy, similarly do not bolster Plaintiff's claim. *Molycorp*, 2015 Del. Ch. LEXIS 152, at *38; *Cent. Laborers' Pension Fund*, 2025 Del. Ch. LEXIS 99, at *17.

89. Further, with respect to the HMF Advisory Contract and the agreements to sponsor new funds, the Evergreen Fund LLC Agreement expressly authorizes members, managers, and their affiliates, like Defendants, to "engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others." (ECF No. 67.3, § 3.3(b)). Thus, the parties expressly contemplated, and permitted, such situations.

90. In short, while Defendants' alleged conduct might justify questions as to HIP's ultimate competence as manager (and Perkins's qualifications to manage any entity), the conduct alleged—particularly when combined with the language of the LLC Agreement—does not give rise to a reasonable inference that Defendants face a "substantial likelihood" of liability. *See Wood*, 953 A.2d at 141 n.11 (explaining that

---

(ECF No. 55.1, ¶ 53), Plaintiff does not allege that the HMF board's approval was *required* to effectuate the Evergreen Fund transaction, nor are there factual allegations for why this might be the case. Even allegations in the complaint that the HMF-Ben Transaction was "[i]n the Ben Transaction" or that it was effectuated "[a]s a result of the Ben Transaction" do not suggest that the two transactions were conditional or contingent on each other or otherwise were unable to be completed independently. (ECF No. 55.1, ¶¶ 7, 9).

the "mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors") (citation omitted); *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 Del. Ch. LEXIS 114, at \*37–39 (Del. Ch. Aug. 1, 2016) (unpublished) (determining that plaintiff's failure to plead particularized facts permitting a reasonable inference that directors faced a substantial likelihood of liability warranted dismissal).

91. Plaintiff's obligation to make a pre-suit demand is therefore not excused on the basis of this second prong of the *Zuckerberg* test.

### iii. Lack of Independence from Others Receiving a Material Personal Benefit or Facing a Substantial Likelihood of Liability

92. Finally, the Court addresses the third *Zuckerberg* prong—whether Defendants lack independence from others receiving a material personal benefit or facing a substantial likelihood of liability in connection with the unmade pre-litigation demand or the cause of action at issue. *Zuckerberg*, 262 A.3d at 1059.

93. Plaintiff does not allege in its amended complaint that Defendants lack independence from any other person or entity receiving a material personal benefit or who would allegedly face a substantial likelihood of liability based on Plaintiff's cause of action. (*See generally* ECF No. 55.1). Plaintiff also makes no such argument in its briefing. (*See generally* ECF No. 69).

94. The Court therefore determines that this prong is inapplicable, that Plaintiff has failed to raise it for consideration, and that Plaintiff otherwise has failed to meet

its burden with respect to this prong, such that it does not provide a viable basis on which Plaintiff may claim that its obligation to make a pre-suit demand was excused.

95.    Accordingly, having considered the amended complaint and the parties' arguments, the Court determines that the amended complaint fails to plead with the requisite particularity the facts necessary to establish that its pre-suit demand obligation was or should be excused. It is therefore appropriate to dismiss Plaintiff's complaint and this action. *See Alford*, 327 N.C. at 540 (addressing considerations for dismissal of derivative actions under § 57D–8–04); *Zuckerberg*, 262 A.3d at 1058 (articulating tests for demand futility pleading in derivative actions under Delaware law).

### c.  Nature of Dismissal

96.    Having determined that Plaintiff's amended complaint should be dismissed, the Court finally considers whether the dismissal should be with prejudice, as Defendants argue, or without prejudice, as Plaintiff has previously argued. *Compare* ECF No. 67 at 28 *with* ECF No. 69 at 1 n.1.[6]

97.    Under Rule 12 of the North Carolina Rules of Civil Procedure, a court is required to dismiss an action when the court lacks subject matter jurisdiction. N.C. R. Civ. P. 12(h)(3); *Meyer*, 2025 NCBC LEXIS 140, at *10 (dismissing derivative

---

[6] Without substantive analysis, Plaintiff points in a footnote to arguments made in briefing on an earlier motion. To the extent Plaintiff seeks to incorporate those arguments by reference or otherwise have the Court consider those arguments without inclusion in the brief before the Court, this violates Rule 7.8 of the Business Court Rules, and the Court declines to consider arguments made in earlier briefing that is not before the Court. *See* BCR 7.8 ("A party may not incorporate by reference arguments made in another brief…").

action under Delaware law without prejudice for lack of subject matter jurisdiction and lack of standing).

98. "[S]tanding is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Soc'y for the Hist. Pres. of the Twenty-Sixth N.C. Troops, Inc. v. City of Asheville*, 385 N.C. 744, 748 (2024) (citation omitted); *In re Z.G.J.*, 378 N.C. 500, 504 (2021).

99. Under Delaware law, a putative derivative plaintiff has no cause of action or claim to assert (and, thus, no standing) until the plaintiff either complies with the pre-suit demand requirement or establishes that demand would be futile. *Egelhof*, 2006 NCBC LEXIS 5, at *18 ("The right of a Delaware corporation's shareholder to bring a derivative action does not come into existence until (1) he has made a demand on the corporation to institute the action itself, (2) his demand has been refused, or (3) he demonstrates that demand on the corporation would have been futile.").

100. In the context of putative derivative actions proceeding under Delaware law in North Carolina, when dismissing such actions for lack of subject matter jurisdiction, this Court's case law is split as to whether dismissal should be with or without prejudice for lack of subject matter jurisdiction. More recent cases, however, have generally dismissed such actions without prejudice. *Compare In re Pozen S'holders Litig.*, 2005 NCBC LEXIS 7, *44 & n.4 (N.C. Super. Ct. Nov. 10, 2005) (declining to excuse demand and dismissing complaint with prejudice) (citing *White v. Panic*, 783 A.2d 543, 557 (Del. 2001); *Smith v. Raymond*, 2010 NCBC LEXIS 20, *13 (N.C. Super. Ct. Oct. 21, 2010) (dismissing putative derivative complaint with

prejudice under Delaware law on demand futility grounds); *Egelhof*, 2006 NCBC LEXIS 5, at \*18 & n.5 (same), *with Meyer*, 2025 NCBC LEXIS 140, at \*28 (dismissing putative Delaware derivative suit without prejudice); *Kane v. Moore*, 2018 NCBC LEXIS 157, \*36 (N.C. Super. Ct. Nov. 26, 2018) (dismissing both putative Delaware and North Carolina derivative claims without prejudice).

101. At least some case law suggests that dismissal with prejudice may be appropriate for lack of subject matter jurisdiction when the plaintiff is precluded from filing in another forum. *E.g.*, *Forsythe v. N.C. Dep't of Revenue*, 2022 NCBC LEXIS 106, \*10–11 (N.C. Super. Ct. September 9, 2022) ("Although '[a] dismissal for lack of jurisdiction is generally a dismissal without prejudice' to permit a plaintiff to pursue the dismissed claims in a different forum," it is appropriate under North Carolina law to dismiss such an action with prejudice when a plaintiff "cannot cure [its] procedural default or proceed in any other forum." (citations omitted)).

102. However, as our appellate courts have made clear, when a court lacks subject matter jurisdiction, dismissal should be without prejudice. *Pugh v. Howard*, 288 N.C. App. 576, 588 (2023) ("[W]hen a trial court determines that it lacks subject-matter jurisdiction over a matter because of the plaintiff's failure to establish standing, the *court may not dismiss the matter with prejudice* pursuant to Rule 12(b)(6). Rather, in such circumstances, the matter is properly dismissed *without prejudice pursuant* to Rule 12(b)(1)." (internal citation omitted) (emphasis added)); *Lee v. Lee*, 296 N.C. App. LEXIS 860, at \*11 (2024) (unpublished) ("The trial court found that it lacked subject matter jurisdiction, which necessarily prevented it from

reaching the merits of the case, *a pre-requisite for* both an application of Rule 12(b)(6) and *dismissal with prejudice.*" (emphasis added)); *Holton v. Holton*, 258 N.C. App. 408, 415 (2018) ("[A] dismissal under Rule 12(b)(1) *must be made without prejudice*, since a trial court without jurisdiction would lack authority to adjudicate the matter." (emphasis added)); *see also United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612, 650 (2022) ("[W]hen a complaint is dismissed for lack of subject matter jurisdiction, that decision does *not* result in a final judgment on the merits . . ." (citation omitted)).

103. Here, as the Court determines that Plaintiff lacks standing and that the Court lacks subject matter jurisdiction pursuant to Rule 12(b)(1), as in *Meyer*, the Court, in the exercise of its discretion, will grant the motion to dismiss without prejudice. *Meyer*, 2025 NCBC LEXIS 140, at \*28.

## III.    CONCLUSION

104. Accordingly, the Court **GRANTS** Defendants' and Nominal Defendant's motion to dismiss, (ECF No. 66), and this action is **DISMISSED WITHOUT PREJUDICE**.

    **SO ORDERED**, this 11th day of February 2026.

                            /s/ Matthew T. Houston
                            Matthew T. Houston
                            Special Superior Court Judge
                             for Complex Business Cases